I, Jason R. Carter, being first duly sworn, do depose and state that:

1.      I am a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), currently assigned to the DEA Springfield, Missouri, Resident Office. As such, I am an investigative and Federal law enforcement officer of the United States of America, authorized to conduct investigations of, and to make arrests and seizures for, offenses enumerated in the "Controlled Substances Act," Title 21, United States Code.

2.      Your affiant has been a sworn law enforcement officer for over seven (7) years. I have received specialized training relating to the manufacture, distribution, and possession with the intent to distribute controlled substances. Further, from my training and field experience, I have extensive knowledge of complex illegal drug manufacturing and/or distribution operations.

3.      I have personally conducted or assisted in numerous investigations of criminal violations of the Controlled Substances Act and federal drug trafficking statutes. Many of these investigations focused on organizations who have distributed, manufactured, or derived income from illegal sources, specifically from the unlawful distribution of methamphetamine and other controlled substances.

4.      In addition to my experience in conducting criminal investigations, I have received specialized training from the DEA and other law enforcement agencies. The trainings focused on methods of unlawful drug trafficking; the identification of controlled substances; the means by which drug traffickers derive, launder, and conceal their profits from drug trafficking; the use of assets to facilitate unlawful drug trafficking activity; and the law permitting the forfeiture to the

United States of assets purchased with drug proceeds or assets used or intended to be used to facilitate the drug violations.

5.    I have participated in the execution of numerous search warrants in the investigation of drug trafficking. These warrants covered the search of locations to include residences of drug traffickers and their co-conspirators and associates, drug manufacturing operations, stash houses used as storage and distribution points for controlled substances, and business offices used by drug dealers as fronts to legitimize their unlawful drug trafficking activities and to conceal the proceeds obtained from unlawful drug trafficking.

6.    This affidavit is based on an ongoing investigation by the DEA. All the information within this affidavit is based upon my personal knowledge, information provided from other law enforcement officers, and court authorized interceptions of wire and electronic communications.

## PURPOSE OF AFFIDAVIT

7.    This affidavit sets out circumstances and information that gives me probable cause to believe that William JONES and other members of the drug trafficking organization (DTO) headed by JONES, have been involved in the commission of possession with intent to distribute a controlled substance and distribution of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1); conspiracy to distribute controlled substances, in violation of Title 21, United States Code, Section 846; unlawful use of a communication facility to commit and facilitate the commission of drug trafficking offenses, in violation of Title 21, United States Code, Section 843(b); and laundering of monetary instruments and engaging in monetary transactions in property derived from specified unlawful activity, in violation of Title 18, United States Code, Sections 1956 and 1957. I am seeking evidence related to these offenses that includes, but is not limited to, records related to money laundering, as outlined in detail in

ATTACHMENT B, which is incorporated by reference herein and which shall be attached to the search warrant requested by this affidavit.

8.     I also have probable cause to believe, based on the information set out in this affidavit and my training and experience, that the items described in ATTACHMENT B are evidence, fruits, and instrumentalities of the above described offenses, and that there is probable cause to believe that these items will be found in the location described herein.

9.     I have probable cause to believe that a search of this location will lead to evidence of the aforementioned crimes as well as the identification of individuals who are or have been engaged in the commission of those crimes.  The controlled substances that are the primary focus of this investigation are methamphetamine, cocaine, and marijuana.

10.     Based on information supplied by Confidential Source #1 (CS #1), as well as court authorized interceptions of wire and electronic communications, calls from inmates in the Missouri Department of Corrections (MDOC), past police reports from the Springfield, Missouri, Police Department (SPD) and other jurisdictions, and analysis of information gathered by investigators to this date, it is believed that known members of the William JONES DTO are directly responsible for supplying a substantial amount of methamphetamine, cocaine, and marijuana in the Springfield, Missouri, area.

11.     Because this affidavit is submitted for the limited purpose of establishing probable cause to search the location further described in Attachment A for the items listed in Attachment B, not all of the information known to me about this investigation have been included in this affidavit.

### **LOCATION FOR WHICH PERMISSION TO SEARCH IS SOUGHT**

12.     This affidavit is submitted in support of an application for a warrant authorizing the search of a location in the Western District of Missouri.

13.     The location sought to be searched and its descriptions is as follows: 44 Goss Lane, Fair Grove, Dallas County, Missouri, is a brown in color, two-level, single-family residence occupied by Leland and Marilyn Courtney.  Hereinafter referred to as **LOCATION #1** and further described in ATTACHMENT A.

14.     Another location is described in this affidavit and will be referred to as follows throughout this affidavit: 9 Crestview Lane, Fair Grove, Dallas County, Missouri, is a single-family residence.  The residence is occupied by JONES and his live-in girlfriend, Kristen CONWAY.  Hereinafter referred to as **LOCATION #2**.

## BASIS OF INFORMATION

15.     Except as otherwise noted, the information set forth in this affidavit has been provided by me or provided to me by law enforcement agents or officers of the DEA and other cooperating law enforcement agencies.  Unless otherwise noted, whenever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer with whom I have spoken or whose report I have read and reviewed.  The officers may have based their information on either direct or hearsay knowledge.

16.     The information resulting from physical surveillance, except where otherwise indicated, is not necessarily from personal observations, but was provided directly or indirectly by members of the DEA or other law enforcement officers who conducted the surveillance.

17.     Likewise, any information pertaining to vehicles and/or registrations, personal data on subjects, and record checks has been obtained through the National Crime Information Center (NCIC), the Missouri Uniform Law Enforcement System (MULES), and Law Enforcement Data System (LEDS), the SPD reporting system, the MDOC records, or the Polk County Sheriff's Office (PCSO) reporting system.

18.    All subscriber, toll record, pen register, and trap and trace information contained herein were obtained by court order or subpoena.

19.    As this affidavit is being submitted for the limited purpose of securing authorization for the search of the listed location for physical evidence related to the crimes listed above, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish the foundation for an order authorizing the search of the listed location and vehicles.

### INVESTIGATION OVERVIEW

20.    In June 2016, I conducted an interview of CS #1. CS #1 said that he/she knew of a female in the Pleasant Hope, Missouri, area that was selling large amounts of methamphetamine, cocaine, and marijuana, named Crystal BURDETTE. CS #1 has proven reliable during the course of this investigation in that the information he/she provided has been substantially corroborated by phone tolls, surveillance, interceptions of wire and electronic communications, and in June 2017, CS #1 also conducted a controlled buy of methamphetamine from Donald CASTEEL, who I know to be an associate of JONES' through phone tolls and the interception of wire and electronic communications.

21.    During the interview in June 2016, CS #1 stated that sometime during the week of April 28, 2016, he/she had provided BURDETTE with a ride to the Harbor Freight Tools store located at 3909 South Campbell Avenue, Springfield, Missouri. CS #1 got out of the vehicle upon their arrival at the store, and BURDETTE took the vehicle to an unknown residence in the area.

22.    Based on BURDETTE's direction of travel and the short amount of time she was gone, CS #1 believed the residence was on or near Fairview Avenue, which is one block west of the

Harbor Freight store. When BURDETTE returned, she was in possession of a kilogram of cocaine. CS#1 then drove BURDETTE back to her residence. When they got there, CS #1 observed the kilogram of cocaine and stated that it had been packaged in saran wrap and a significant amount of carbon paper. Based on BURDETTE's statements to CS #1, and CS #1 overhearing a phone conversation between BURDETTE and her source of supply, CS #1 knew BURDETTE had paid $30,000.00 for the kilogram of cocaine.

23.     CS #1 also stated he/she believed BURDETTE was partnered with an associate of the Galloping Goose Motorcycle Club, which is a 1% Outlaw Motorcycle Gang with a chapter in the Springfield, Missouri, area. The term 1% stems from the idea that 99% of motorcycle riders are law-abiding citizens and the remaining 1% of the motorcycle riding population consider themselves "outlaws" that do not abide by society's laws.

24.     CS #1 believed BURDETTE's connection to that criminal organization was a member named "Willy." CS #1 described "Willy" as a white male in his early forties with noticeable acne scarring on his face. CS #1 also knew "Willy" had recently been released from MDOC.

25.     CS #1 provided me with phone number (417) 877-6852 for BURDETTE. In November 2016, I submitted an administrative subpoena to Verizon Wireless Corporation (Verizon) for the subscriber information and 30 days' worth of phone tolls for that number.

26.     Verizon identified (417) 877-6852 as a phone number utilized by "Crystal Gott" with an address of 1958 State Highway KK, Pleasant Hope, Missouri. The account was established on August 14, 2016. Based on monitoring of a Facebook account in BURDETTE's name that CS #1 directed me to, I knew that "Gott" was the last name of BURDETTE's live-in boyfriend,

Travis Gott. Additionally, that address was listed in the PCSO's reporting system as a known address for BURDETTE.

27.     The toll analysis of that number revealed it was in frequent contact with a phone number of (417) 496-0575 (hereinafter Target Telephone 1). A Facebook search of that number revealed it was associated with a Facebook account bearing the name of "Willy Jones." I compared photos from that Facebook page to the MDOC booking photos of William JONES, and found they were photos of the same person. JONES' criminal history listed a past address as 44 Goss Lane, Fair Grove, Missouri (**LOCATION #1**). I also discovered that Target Telephone 1 was subscribed to an account under the name of Leland Courtney.

28.     JONES was also listed as a known member of the Southwest Honkeys prison gang, as documented by the MDOC and the SPD. My investigation has shown that JONES and many of his associates are either members of, or associated with, a prison gang in the Southwest Missouri area called the Southwest Honkeys. The Southwest Honkeys have a structure with ranks for members, bylaws of the group have been recovered in past warrant executions by SPD, and each member has a "patch" or tattoo, which is often referred to as a "spinner" because of its spinning swastika appearance, and members often have tattoos that read "S.W. Honkey." SPD and MDOC keep records of the members of this organization, based on determinations made using a point system where individuals receive points for things such as admitting membership (9 points), being arrested with another confirmed member (9 points), having a gang tattoo (8 points), being confirmed by another law enforcement gang unit (8 points), identified by a reliable informant (8 points), being identified by another gang member (8 points), using gang symbols (4 points), admitting to knowledge of gang activity or being in possession of gang documents (4 points), and other activities (2 points). If an individual receives at least 10 points, that person is

considered a documented member of the gang. If I have noted below that an associate of JONES is a documented member of the Southwest Honkeys, that information was obtained from those records.

29.     After I identified JONES as the user of Target Telephone 1, I then submitted an administrative subpoena to the Sprint Corporation for the subscriber information and 30-days' tolls for Target Telephone 1. Their response revealed the phone's subscriber was listed as Leland Courtney with an address of **LOCATION #1**. Leland Courtney was listed as a "Facebook Friend" of the profile utilized by JONES, as well as the Facebook profile pages bearing the names of Marilyn Courtney and Robert COURTNEY. Based on the comments posted to those profile pages, it appeared Leland and Marilyn Courtney are married and the parents of Robert COURTNEY.

30.     Utilizing the SPD reporting system, I found Leland Courtney was the co-owner of the shopping center at 3909 South Campbell Avenue, Springfield, Missouri. That shopping center houses multiple businesses, including Harbor Freight Tools. As noted above, Harbor Freight Tools is where CS #1 drove BURDETTE when she purchased the kilogram of methamphetamine in April 2016. Utilizing the Missouri Secretary of State's publicly accessible website, I found Leland Courtney was also the owner of "Fly By Night Transportation (FBNT)," which listed its address as **LOCATION #1**. Leland Courtney's Facebook page also identified him as the "President" of "FBNT, Inc."

31.     I also found a Springfield, Missouri, city utilities account in the name of Marilyn Courtney at an address of 2830 West Swan Street, Springfield, Missouri. The SPD reporting

system identified that location as the residence of Robert COURTNEY. Due to the possible connection between JONES and COURTNEY, I began conducting surveillance of that address.

32. On November 1, 2016, SPD Detective Brandon Bowling and I established surveillance at that location. While there, we observed a black in color Chevrolet Blazer that had no license plates, as well as a black in color 1997 Ford F-350 bearing Missouri plates 5YN 254, parked in the driveway of the residence. The license plate on the truck was registered to Leland Courtney at **LOCATION #1**.

33. At approximately 9:00 p.m., the Chevrolet Blazer left the residence. Detective Bowling and I followed the Blazer to a nearby Fast and Friendly gas station, located at 3023 South Scenic Avenue, Springfield, Missouri. I observed the Blazer to be occupied solely by a white female with red hair, later identified as Morgan Roberts. I requested a patrol officer stop the vehicle for the license plate violation.

34. SPD Officer James Dougherty responded to the area and located the Blazer as it left the parking lot of the gas station. Officer Dougherty conducted a traffic stop of the vehicle near Scenic Avenue and Walnut Lawn for failing to display a rear license plate. He contacted the driver, and identified her as Roberts. During the traffic stop, Officer Dougherty smelled a faint odor of marijuana emanating from the vehicle. He also found Roberts had two active misdemeanor warrants out of the City of Springfield, Missouri. Officer Dougherty arrested Roberts for the warrants, and conducted a probable cause search of the vehicle based on the smell of marijuana. During that search, Officer Dougherty located a small baggie containing a white, crystalline substance consistent with methamphetamine, and a small baggie containing a green,

leafy substance consistent with marijuana. Roberts was transported to SPD's South District Station where Detective Bowling and I conducted an interview with Roberts.

35.     During the post-*Miranda* interview, I asked Roberts about the contraband located in her vehicle. She stated she did not know the items were in the vehicle and claimed multiple people drive the vehicle without her present. Roberts admitted to regularly using methamphetamine and stated she already had one pending drug case out of Greene County, Missouri, Circuit Court for a drug violation.

36.     I asked Roberts if she had any information about drug activity. Roberts was very nervous and was initially hesitant to talk about known drug associates. She ultimately told me I should "look in Dallas County (Missouri)." I asked her to elaborate, and Roberts stated that her roommate, Robert COURTNEY, worked for his father at a trucking company in Fair Grove, Missouri. Roberts stated COURTNEY sold ounces of methamphetamine, and he was supplied by a male named, "Willy." Based on my prior investigation, and JONES' connections to the members of the Courtney family, I suspected "Willy" to be William JONES.

37.     Roberts stated she did not know much about JONES or COURTNEY's drug operation, but she had heard Robert COURTNEY brag about having pounds of cocaine concealed in oil drums. Roberts believed he was referring to oil drums located at the trucking company's shop. Based on that **LOCATION #1** is the registered address of the Courtney's trucking company and has a large detached building on it that appears to be a shop, I believe Roberts was referring to **LOCATION #1**. Shortly after that, Roberts ended the interview, citing a fear of retaliation from JONES or COURTNEY for cooperating with police.

38.     I continued to obtain the phone tolls of TARGET TELEPHONE 1, and found that JONES was in regular contact with phone number (417) 234-8887.  A Facebook search of that number revealed it was associated with a Facebook profile bearing the name of Nathaniel EISENHOUR. I am familiar with EISENHOUR, have arrested him in the past, and identified the pictures on the Facebook profile as being EISENHOUR.  I know him to have a history of vehicle theft, burglary, and drug use.  He was also a known member of the Southwest Honkeys prison gang, as documented by MDOC and the SPD.

39.     While investigating EISENHOUR, I located an SPD report filed by Taylor Stenquist on December 15, 2016.  Stenquist reported EISENHOUR was at her apartment early that morning. Stenquist said that, at that time, EISENHOUR was in possession of a money counter and a large blue bag.  While he was there, EISENHOUR opened that blue bag and removed a glass smoking pipe and what she believed was a large bag of methamphetamine.

40.     On December 21, 2016, EISENHOUR was arrested on a parole violation warrant at 1772 South Glenstone Avenue, Springfield, Missouri.  On January 9, 2017, I contacted the Greene County, Missouri, Jail (GCJ) and requested copies of EISENHOUR's recorded phone calls.

41.     Inmates using the jail phone system are notified at the beginning of the call that the call is recorded and subject to monitoring.  After I received them, I began reviewing the calls, and found that many of them involved conversation about drug activity using vague or coded language.

42.     In my training and experience, I have learned that those involved in the drug trade often use vague and coded language while talking on the phone in an attempt to conceal their drug activity should law enforcement hear the conversation.

43.     One example of those conversations was a GCJ call from EISENHOUR to Joshua PRUETT at phone number (417) 849-2933 on December 26, 2016, at 10:28 p.m.  I knew

EISENHOUR was talking to PRUETT, because I recognized PRUETT's voice from when he had been present with EISENHOUR's girlfriend during prior conversations I had monitored, and EISENHOUR had identified him by name. EISENHOUR talked about PRUETT collecting money owed to EISENHOUR for drug debts. He also said, "I need to know what's up with Willy and those," "that's 65 apiece," and "he got three." Based on my later investigation and a later call between EISENHOUR and Target Telephone 1, I believe the "Willy" that EISENHOUR referred to is JONES. Based on my training and experience, I also believe the conversation above meant that EISENHOUR believed that JONES had purchased three pounds of methamphetamine from EISENHOUR for $6,500 per pound, which was consistent with the current market value of pounds of methamphetamine.

44.     EISENHOUR was transferred to an MDOC facility in Fulton, Missouri, in late December 2016, so I requested copies of his phone calls at that facility as well. Similar to the jail calls, inmates are notified at the beginning of the call and at intervals during the call that the calls are recorded and subject to monitoring.

45.     On January 1, 2017, at 9:13 a.m., EISENHOUR contacted PRUETT, and they discussed money that was supposed to be collected from JONES by PRUETT. EISENHOUR said he thought PRUETT had "14 stacks" from JONES. PRUETT told him he had it, but it was not from JONES. EISENHOUR said, "So you have $14,000 to give to my Grandpa?" PRUETT confirmed he had the money, but again said it was not from JONES. EISENHOUR said, "If Willy got two and a half, he owes more than that." PRUETT replied, "No, I got the big side."

46.     Using more vague language, they discussed that PRUETT and JONES split EISENHOUR's load of methamphetamine after EISENHOUR was arrested by SPD, and

PRUETT received a larger portion than JONES. EISENHOUR explained that he thought it was supposed to go the other way around.

47.     On January 1, 2017, at 7:39 p.m., EISENHOUR's prison phone account contacted Target Telephone 1, and I recognized EISENHOUR's voice as he spoke to a male EISENHOUR referred to as "Willy," who based on my investigation, I believed to be JONES. During that conversation, EISENHOUR expressed his doubts about PRUETT's ability to handle EISENHOUR's business while EISENHOUR was incarcerated. EISENHOUR told JONES he planned on JONES getting "everything," but PRUETT took it instead. EISENHOUR felt PRUETT was taking advantage of the situation, and JONES agreed.

48.     JONES then told EISENHOUR, "I got you dog. I wasn't going to give it to him, and I wasn't going to give it to nobody until I talked to you." JONES later said, "The money will be where I work. You know what I mean? In the safe." EISENHOUR says, "I know you got me."

49.     During another call that was placed on January 16, 2017, at 9:49 a.m., EISENHOUR contacted JONES at (417) 669-4820. I immediately recognized the voice of JONES as he answered the call. During that conversation, JONES again commented about the money he had for EISENHOUR by saying, "I got this up here in the safe," again referring to the money owed to EISENHOUR for the drug debt incurred when Pruett gave EISENHOUR's methamphetamine to JONES after EISENHOUR's arrest. EISENHOUR replied by telling JONES to keep it because he may have to take it to his attorney at some point.

50.     Other jail conversations I monitored around that time between EISENHOUR and PRUETT led me to believe that EISENHOUR had had PRUETT take money that PRUETT owed him to EISENHOUR's grandfather's home. On January 30, 2017, DEA Special Agent (SA) Tim Krisik obtained a federal search warrant for the residence of EISENHOUR's grandfather, Roy

Eisenhour, at 2232 South Roanoke Avenue, Springfield, Missouri. Later that same date, agents proceeded to the address and contacted Roy Eisenhour. I told Roy Eisenhour my investigation had revealed that Roy Eisenhour was storing drug proceeds on EISENHOUR's behalf. Roy Eisenhour was a little hesitant initially to admit he was storing money, but then said, "I knew this was going to happen." I asked Roy Eisenhour if it was true that he had EISENHOUR's money, and he confirmed it was. I asked Roy Eisenhour if he would willingly turn that money over to agents for seizure, and he agreed to do so. The currency was officially counted on February 1, 2017, and was found to be $31,800.

51.    On March 11, 2017, at 8:03 p.m., EISENHOUR called JONES at Target Telephone 1 from his MDOC account. During that call, the two discussed relationship issues EISENHOUR was having with his girlfriend. He told JONES he was having his friends move all of his belongings out of the apartment he had previously shared with his girlfriend. He expressed concern about storing the items as he could not afford to keep a storage unit. JONES reminded EISENHOUR about the money he was storing by saying, "Well, you still got some money out here. You know that, right?" EISENHOUR replied, "I know. I want you to hold on to that for me. Is that gonna be alright?" JONES said, "Yeah." EISENHOUR then said, "I'm gonna need something to come out to, you know what I'm saying?" This conversation provided further evidence JONES was still storing EISENHOUR's drug proceeds and would be until EISENHOUR was released.

52.    On June 20, 2017, DEA TFO James Hamilton contacted the Missouri Department of Revenue regarding employment and reported income for JONES. According to their records, JONES reported his employer as FBNT, LLC, with an address at **LOCATION #1**. During the

15-month period from January 2016 through March 2017, JONES' reported income only totaled $7,079.

53.     The aforementioned conversation between EISENHOUR and JONES, coupled with the information provided by the Missouri Department of Revenue that JONES was employed by FBNT, indicated JONES was storing drug proceeds in a safe at **LOCATION #1**. EISENHOUR is still in the MDOC. I have continued to monitor prison calls between EISENHOUR and JONES and have not heard them discuss JONES moving that money, which leads me to believe it is still at **LOCATION #1**.

54.     On June 18, 2017, documented Southwest Honkey gang member Kyle EVANS was involved in a motorcycle crash after attempting to flee from Greene County, Missouri, Sheriff's Office (GCSO) Deputy Jason Conner. Shortly after EVANS eluded Deputy Conner, EVANS crashed the motorcycle. Deputy Conner located EVANS lying in the roadway near Nichols Street and Orchard Crest Avenue in Springfield, Missouri. Deputy Conner observed a nylon pistol holster in EVANS' waistband and a Glock handgun lying in the roadway next to EVANS. While searching EVANS' pockets for identification, Deputy Conner found EVANS was in possession of $1,633 in United States currency. SPD Officer Casey Wilson responded to complete the crash report and located a motorcycle tank bag near the crash location. That bag contained four baggies that contained a total of approximately six grams of methamphetamine. EVANS was transported to a local hospital for treatment.

55.     In January of 2017, I began requesting any MDOC inmate phone calls made to Target Telephone 1. On July 18, 2017, at 12:02 p.m., Jerod ELEY contacted Target Telephone 1 from MDOC. ELEY was a known member of the Southwest Honkeys as well, as documented by MDOC and the SPD. Approximately 19 minutes into the call, JONES told ELEY he had

received a phone call from "Simcoe," known to be William SIMCOE, another documented member of the Southwest Honkeys.

56.     JONES told ELEY that SIMCOE had said, "Look, are you listening?"  JONES, said he replied, "Yeah."  JONES said SIMCOE had replied, "The cops got Lee and Marilyn's house surrounded right now."  JONES said he had replied, "Oh fuck."  ELEY asked, "Seriously?"  JONES said, "Yeah, but the neighbor OD'd.  They weren't even there for them (Leland and Marilyn).  But you can believe one thing.  There was motherfuckin' crippled bastards running around, trying to hide in the pond, and all kinds of shit."  ELEY asked, "Whenever you got that phone call, how did you feel?"  JONES replied, "Well, here goes!"  He laughed and said, "You know what I mean?  I didn't really know how to feel."

57.     Based on the information I had learned from my interview of Roberts and the information JONES was concealing drug proceeds at his "work," I believed JONES uses **LOCATION #1** as a stash location for contraband and proceeds.  The aforementioned conversation with ELEY indicated JONES had been significantly worried about a police presence at "Lee and Marilyn's" (**LOCATION #1**) during the time of the call with SIMCOE, which would be expected if he was using the residence as a stash location.

58.     On August 11, 2017, U.S. District Court Judge M. Douglas Harpool signed a court order in case number 17-WT-0004-MDH, authorizing the interception of wire and electronic communications to and from Target Telephone 1.

59.     On August 14, 2017, at 7:51 p.m., agents intercepted a telephone call from (417) 920-6416, a number associated with EVANS.  I knew this number was utilized by EVANS for many reasons.  The first being that I recognized EVANS' voice during the intercepted communication because his voice is distinct.  I have learned his voice from reviewing numerous prison calls

made to and from various Southwest Honkey gang members, and from an interview I have conducted of EVANS in the recent past. Secondly, an administrative subpoena for that phone number revealed it is registered to "Ricky" Evans with an address of 1019 ½ West Lynn Street, Springfield, Missouri. EVANS' middle name is Richard, and he uses a nickname of "Ricky." A past SPD report from June 2017 listed that address as the residence of EVANS. Lastly, I was able to conduct a Facebook search of that number, and found it was associated with a Facebook profile page bearing EVANS' name.

60.    During that call, EVANS spoke to JONES and indicated that he planned to assault a known female associate of the Southwest Honkeys, identified as Carolyn Carpenter, for allegedly cooperating with the police. EVANS conducted the assault in an effort to protect the Honkeys. EVANS told JONES he needed to know what Carpenter told police, and he thought assaulting her was the best way to draw that truth from Carpenter. Agents attempted to intervene in that assault, but were unsuccessful in locating Carpenter.

61.    On August 15, 2017, at 9:35 a.m., (417) 693-8648, a number associated with SIMCOE, contacted JONES on Target Telephone 1. An administrative subpoena revealed that telephone number is a Sprint Corporation cellular telephone number registered to William SIMCOE at his residence, 701 East Smith Street, Springfield, Missouri. A Facebook search of that number also revealed that it is associated with a profile bearing SIMCOE's name and photo. That Facebook profile is listed as a "Facebook Friend" of JONES and other known Southwest Honkey gang members. I also recognized SIMCOE's voice when he spoke to JONES from having heard SIMCOE's voice while reviewing numerous prison calls to and from incarcerated Southwest Honkeys and their associates.

62. During that call, SIMCOE and JONES discussed the events from the previous night – EVANS' assault of Carpenter. JONES asked SIMCOE what happened, and SIMCOE said that EVANS and his "ol' lady" (EVANS' unknown girlfriend) had, "Beat the shit out of her" (Carpenter). SIMCOE told JONES he had "diverted it and cleaned it up." He told JONES he got EVANS out of the house, and had two other gang members, Darrell DELONG and Allen CASSIDY, take "her" to a "safe place."

63. Their conversation continued, and they discussed EVANS running around "unleashed." SIMCOE told JONES he had tried to mentor EVANS on multiple occasions but had apparently been unsuccessful. They agreed he was "out of control," and discussed getting him out of the Springfield area in order to prevent him from drawing unwanted attention from law enforcement.

64. SIMCOE asked JONES if Carpenter knew where EVANS had been staying, and if she would attempt to contact the police in reference to the assault. JONES stated he did not think she would do so.

65. On August 15, 2017, U.S. Magistrate Judge David Rush signed a court order authorizing the GPS tracking of a phone number (417) 920-6416, which was the same above-mentioned phone utilized by EVANS, based on the information regarding his involvement in the drug trade and gang violence.

66. Utilizing that GPS location information, I found EVANS was staying at **LOCATION #1**. The GPS information revealed EVANS spent a large amount of both day and night time hours at that location over August 17, 2017 (the date of the phone tracker activation), to August 24, 2017, on which date EVANS was arrested by the GCSO after he was found driving a vehicle bearing a stolen license plate.

67.     EVANS was likely the "crippled bastard" JONES had been referring to in the July 18, 2017, conversation with ELEY, as EVANS had received significant injuries in the motorcycle crash.   It also explained why SIMCOE and JONES were so concerned about Carpenter cooperating with police if she had knowledge about EVANS' whereabouts and could bring police attention to **LOCATION #1**.

68.     On August 15, 2017, Dustin PIPER was indicted in the Western District of Missouri for conspiracy to distribute methamphetamine and possession of a firearm in furtherance of a drug trafficking crime.   On August 17, 2017, DEA TFOs Brett Leslie and Keith Mills arrested PIPER in Bolivar, Missouri, and transported him to the United States Marshals Office (USMS) in Springfield, Missouri.

69.     TFO Leslie obtained a post-*Miranda* statement from PIPER regarding his drug activity. PIPER identified his source of methamphetamine supply as a man named "Willy."   PIPER did not know "Willy's" last name, but stated he resided in Fair Grove, Missouri.   PIPER said he had obtained five pounds of methamphetamine a month for a two-year period from "Willy" ending in March 2017.   PIPER said he paid $7,000.00 a pound for the methamphetamine.   PIPER described "Willy" as a six foot tall, white male, weighing approximately 220 pounds.   PIPER alleged "Willy" was "the head of the 417 gang."   Based on PIPER's description, I believe he was referring to JONES.

70.     TFO Leslie asked PIPER how the methamphetamine transactions occurred.   PIPER said "Willy" would bring the methamphetamine to PIPER's residence in Bolivar, Missouri. PIPER said "Willy" fronted the methamphetamine to him at the $7,000.00 a pound, and would return at

a later date to pick up the money from PIPER so he would not be traveling with drugs and money at the same time.

71.     On August 20, 2017, all communication ceased on Target Telephone 1.  Utilizing administrative subpoenas, phone toll analysis, open source Facebook searches, and the review of MDOC prison calls where I identified JONES' voice, I was able to identify JONES' new telephone number as (417) 371-6965 (hereinafter Target Telephone 2).

72.     On September 28, 2017, U.S. District Judge David Gregory Kays signed a court order in case number 17-0005-WT-S-MDH, authorizing the interception of wire and electronic communications to and from Target Telephone 2.  Agents began monitoring the communication on that phone the same day.

73.     While monitoring Target Telephone 2, agents intercepted a call from Target Telephone 2 to (816) 582-6007 that occurred on September 29, 2017, at 11:01 a.m.  That number has been identified as a number utilized by Arthur BARRETT.  An administrative subpoena revealed the phone was registered in BARRETT's name.  The number was also associated with a Facebook page bearing the name of "Art Barrett," which was listed as a "Facebook Friend" of the profile utilized by JONES.

74.     BARRETT is believed to be a source of drug supply for JONES.  That call went as follows (as transcribed by the wire monitor):

| | |
|---|---|
| JONES: | Talking to another person in the back ground. |
| JONES: | Art. |
| BARRETT: | Yeah. |
| JONES: | What's going on buddy? |
| BARRETT: | I'm on the back of a tow truck sitting on my Harley getting it dropped off right now getting it fixed. |
| JONES: | Oh yeah.  If you drive it down here we can get it fixed for you buddy. |
| BARRETT: | Well, it won't ride. |
| JONES: | *Inaudible* |

| BARRETT: | Ugh g** damn shifter fell off in fourth gear. |
| JONES: | Well, that ain't hard to fix. |
| BARRETT: | Well, this guy right here is going to fix it. Right up the street to my house. |
| JONES: | Yeah. |
| BARRETT: | Yeah, What are you doing? |
| JONES: | A roof. |
| BARRETT: | Well, all right, I've got some good news for you if you want to come this way. And ugh, real good stuff man. |
| JONES: | Oh yeah. |
| BARRETT: | And ugh, and ugh, different person. I've known him for thirty years. |
| JONES: | Yeah. |
| BARRETT: | Good Mexican. Goes back and forth to Arizona and back and it starts out at nine five then gets cheaper. |
| JONES: | Alright, um, give me a couple of days to get my ducks in a row. |
| BARRETT: | Ok. |
| JONES: | It's scattered out but yeah I'm definitely interested. |
| BARRETT: | Ok and you'll really like this guy, man, good people, on point. Honest as they get man. |
| JONES: | Good deal. That's the kind of people I like to fuck with. |
| BARRETT: | I know, we ain't got to go through wait, waiting on that Mexican all, all that. It it's on deck and all that. |
| JONES: | All right, Cool (*Talking over each other*). I'm definitely interested. And ugh, (*Talking over each other*). Hey, hey, hey, What about some Reggie? |
| BARRETT: | Yep, I can take care of all of that. All right give me a call later let me get this bike off here, man. |
| JONES: | Alright. |
| BARRETT: | Alright buddy, bye. |

75.     Based on my knowledge, training, and experience, I believe this conversation indicated BARRETT had a load of drugs ready for JONES to pick up. BARRETT also indicated he was using a new source of supply, which he identified as a "different Mexican." Mexico is a known source country for large amounts of illegal narcotics and large-scale drug dealers often deal with someone that has ties to Mexico. BARRETT's statement about the new "Mexican" traveling back and forth to and from Arizona indicated he traffics drugs from Arizona, a border state with Mexico. BARRETT told JONES his new source of supply "starts at nine five, then gets cheaper." I know this to mean the starting price for the drugs sold by the new supplier is $9,500,

which is the current market value for kilogram amounts of methamphetamine. I also know drug dealers will allow for a discounted price if a customer buys bulk amounts.

76.     In this call, JONES also asked BARRETT about obtaining some "reggie," which I know to be a street term used for regular grade marijuana. BARRETT indicated he would be able to supply that to JONES as well. JONES told BARRETT he was "definitely interested," but would need a couple of days to get his "ducks in a row" because it was "scattered." I believe this referred to JONES' need to collect money from his customers, which I know to be common for drug suppliers to do before obtaining another shipment of drugs.

77.     After JONES told BARRETT he needed to get his "ducks in a row," agents began intercepting conversations with multiple people that appeared to be in reference to collecting money. One example of this was an intercepted call that took place on October 2, 2017, at 9:52 p.m., when JONES sent a text message to (417) 655-2348. A Facebook search revealed that number was associated with a profile bearing the name of "Sean Davis," but the identity of the phone's user has not been confirmed as Davis at this time. The text from JONES read, "I haven't met with your buddies and I need to get that from you in the next couple days I have way too much out and have go. Collect." This message was consistent with JONES' previous statement to BARRETT about everything being "scattered."

78.     On October 2, 2017, at 11:52 p.m., JONES sent a text message to (417) 421-3187, a phone known to be used by Bill CROCKER. That message read, "Bring those things you were telling me about tom." I believe this message was coded language in which "those things" referred to money.

79.     At 6:10 p.m., on October 3, 2017, JONES sent a text to his girlfriend, Kristen CONWAY, at (417) 699-4820 that read, "I am going to Barry's with Robby to his trailer and money."

80.  Nineteen minutes later, JONES called (417) 699-2043, and told a male he was on his way

to see him.  A Facebook search revealed that number was associated with the Facebook profile of

"Berry Davis," which is a name consistent with JONES' previous text to CONWAY that said he

was on the way to "Barry's."

81.  At 7:27 p.m., JONES received an incoming phone call from an unknown male at (417)

294-6388.  That call went as follows (as transcribed by the wire monitor):

> Unknown Male: ...right here.  I don't know.  I'll probably put in 15.  I don't know how
> much it's gonna hold.
> JONES: Hello.
> UM: Willy I apologize so much dude.
> JONES: Alright.  Well I'm down here in Reed.
> UM: Are ya?
> JONES: Yeah, I can holler at you before I...when I go to take off.
> UM: OK.  Well anyway I'm up here at Highlandville.  I was just getting
> some gas and getting fueled up and I was coming your way.  Man
> Willy I really feel bad about that.  Dude I been puking, puking and
> everything else all night.  I don't know if I just got a virus or what.
>
> *Talk over each other*
>
> JONES: How do I get ahold of ya just uh?
> UM: Uh...are you by your, well can you come to the house or you rather...I
> mean can you or no or...
> JONES: Well I can meet you somewhere.
> UM: You can just tell me, well I dont really get no signal down there so I
> mean I dont want to miss you cause I need to give this to you.
> JONES: Hmm.
> UM: It's all there.
> JONES: Alright. Um, trying to think how I can do this.  Uh, I don't know.  Give
> me about an hour and can you call me back in 45 minutes?
> UM: Yep.  From right now.  I'll call you back in 45 minutes from, from right
> now.
> JONES: Alright buddy.
> UM: Ok.  I appreciate you Willy.  Thank you.

82.  This call indicated that the unknown male had something to give to JONES, and stated,

"It's all there."  I proceeded to the only gas station in Highlandville, Missouri, Shell Gas Station,

located at 179 Glossip Avenue, Highlandville, Missouri. On my arrival there, I requested to view surveillance footage. The employees stated they were unable to access the footage without a manager. I asked the employees what they remembered about anyone being at that location at approximately 7:30 p.m., the time of the phone call between JONES and the unknown male. The employees told me the only people they remembered were "Chuck and his girlfriend." Due to their familiarity with "Chuck and his girlfriend," and the tendency for gossip to quickly spread in small towns, I did not ask any further questions.

83.    At 8:27 p.m., JONES received a text from the unknown male that read, "Hay u told me 2 cal n 45 min I did 2 times I b at the trail." Two minutes later, the unknown male sent another text that read, "Come on down." Agents attempted to locate JONES in order to conduct surveillance of the meeting between JONES and the unknown male, but they were unsuccessful in locating either party.

84.    At 10:07 p.m., JONES sent CONWAY another message that said, "On way back went by chucks also got money Robbie sold his trailer." This message indicated JONES had met with the unknown male, who I believe to be named "Chuck," and had collected money from him.

85.    On October 3, 2017, at 9:23 p.m., JONES received a text message from an unknown female at (417) 705-0334 that read, "Hello room 101 do I have time to go pick up money b 4 u get here." JONES replied by texting, "Yeah jour." That was immediately followed by another text correcting "jour" to "Hour." At 10:05 p.m., JONES called the same female, and told her he was back in town, and asked if she "got one of them deals yet." She replied by saying she had "ten of them." I believe this was coded language in reference to a sum of money, possibly "$10,000."

86.     On October 2, 2017, at 7:01 p.m., JONES called a female only identified as "Shelly" at (417) 370-5229, who from the conversation appeared to be an accounting student. During their conversation, it was revealed JONES and "Shelly" had planned to meet so "Shelly" could assist JONES with tax preparation for his business, "William Jones Trucking." JONES told "Shelly" their arrangement would not be a "regular job" and that she would get experience in "all of the shortcuts."

87.     JONES told "Shelly" that "Ernie" has not paid his taxes since 2009, and is trying to go "unnoticed" by the Internal Revenue Service (IRS).

88.     Their conversation continued and JONES asked "Shelly" if she was good at producing a contract. JONES told "Shelly" that "Woo" bought a truck and trailer, and he was going to get involved in the business as well. I have heard JONES talk about Jeffery WOOSLEY before in jail calls, and I know "Woo" to be WOOSLEY.

89.     JONES said they own the trucks and trailers outright, but wanted "Shelly" to make contracts that make it appear he and WOOSLEY are making payments to a lease company. I believe this is an attempt to launder money earned through JONES' drug trade. "Shelly" told JONES "that will be easy" and also said she can make it look like he barely earns anything in order to decrease the amount of money he must pay in taxes. "Shelly" asked JONES what his goal was and he told her he would like to avoid "going to prison for tax evasion," and he would like for the IRS to write him a check instead of him paying the IRS.

90.     JONES told "Shelly" he had all of his business documents in his home office and they agreed to meet at a later time so she could go through them before preparing his tax paperwork. From my investigation, surveillance conducted during the investigation both in person and through obtaining GPS information for Target Telephones 1 and 2 and past phones of JONES', I

know that JONES resides at **LOCATION #2**. As noted above, I have already heard JONES tell EISENHOUR that he was keeping his money at "the place he works." As JONES used different language to refer to those two different locations and based on my knowledge of his employment, I believe JONES' home office is at **LOCATION #2,** and what he refers to as the place that he works is **LOCATION #1**.

91.     On September 30, 2017, Target Telephone 2 also received a telephone call from (417) 705-0334, a number associated with an unknown female. During that call, the unknown female and JONES discussed her getting a firearm from someone who owed her money, and JONES asked her to come meet him.

92.     On October 11, 2017, a conversation on Target Telephone 2 showed that JONES would be heading to the Kansas City, Missouri, area that day in order to obtain a load of methamphetamine for re-distribution in the Southwest Missouri area. Agents of the DEA's Springfield, Missouri, Resident Office established surveillance at **LOCATION #2**.

93.     At approximately 9:28 p.m. that same evening, JONES left his residence in a black Volkswagen sedan, and traveled to the Kansas City, Missouri, area. He was accompanied by CONWAY.

94.     Agents maintained surveillance of JONES' movements while in the Kansas City, Missouri, area, and observed him meeting with WOOSLEY on several occasions between October 12, 2017, and October 15, 2017.

95.     On the evening of October 14, 2017, Justin L. RHOADS arrived at the Embassy Suites hotel in Overland Park, Kansas, in a white Chevrolet S-10 truck bearing Missouri license plate 4UY 418. Agents watched as RHOADS met with JONES and WOOSLEY in the parking lot for approximately a half-hour before JONES and RHOADS walked into the hotel. WOOSLEY left

the hotel lot on his motorcycle at that time. Approximately one hour later, RHOADS left the hotel in his truck.

96. The next day, on October 15, 2017, at approximately 6:10 a.m., agents saw WOOSLEY leave the hotel on his motorcycle and drive to a nearby Wal-Mart, located at 11701 Metcalf Avenue, Overland Park, Kansas, where agents observed him go inside the store. Approximately 15 minutes later, WOOSLEY exited the store carrying what appeared to be a small, dark-colored, bag. WOOSLEY secured the bag to his motorcycle in a cargo net and returned to the Embassy Suites hotel. Agents were not able to observe what room that WOOSLEY went into when he returned to the hotel.

97. At approximately 9:00 a.m., agents observed RHOADS return to the hotel parking lot in the same white Chevrolet truck he had driven the day before and wait in his truck. Approximately 10 minutes later, JONES exited the front doors of the hotel carrying a large, black duffel bag. He waved to RHOADS and walked to the black Volkswagen before setting the black duffel bag on the ground next to the Volkswagen. RHOADS moved his truck and parked next to JONES and the Volkswagen, so that the bag was between the Volkswagen and the truck. The two removed a large box from the backseat of the Volkswagen and placed it in the bed of RHOADS' truck. RHOADS then picked up the large black duffel bag and placed it in the cab of the truck behind the driver's seat. RHOADS and JONES talked for a while in the lot before RHOADS left in his truck with the duffel bag.

98. Agents maintained surveillance of RHOADS as he drove southbound on U.S. Highway 71 out of the Kansas City, Missouri, area. Agents coordinated with the Missouri State Highway Patrol (MSHP), who conducted a traffic stop of RHOADS' truck on Missouri Highway 13, just south of Humansville, Polk County, in the Western District of Missouri.

99.     During that stop, troopers conducted a probable cause search of the vehicle based on the intelligence gathered and observations made by myself and other agents. During that search, MSHP Sergeant Gary Braden located the black duffel bag behind RHOADS' driver's seat. Inside that bag, Sergeant Braden located 10 Ziploc-style plastic bags that contained a white, crystalline substance consistent with methamphetamine.

100.    RHOADS was transported to the MSHP office in Bolivar, Missouri, for processing. I responded to that location and took possession of the duffel bag and its contents.

101.    I later weighed the 10 plastic bags and their contents, and found they had a cumulative weight of 21 pounds, a distributive amount of methamphetamine. A field test of the substance in one of the bags showed a positive result for the presence of methamphetamine.

## INFORMATION TO BE OBTAINED BY SEARCH

102.    I know from my training and experience as a police officer and narcotics investigator that persons involved in the illegal distribution of narcotics hide items related to their illegal narcotics trafficking, specifically U.S. currency in large amounts in hidden compartments within vehicles, storage compartments, and residences that they maintain or control or to which they have access, or that are maintained or controlled by their drug-trafficking associates.

103.    I know from my training and experience that most people, including people involved in unlawful delivery and possession of controlled substances and money laundering, possess items of identification or false identification, including, but not limited to, drivers licenses, papers and documents and effects or items which show possession, dominion and control of residences, vehicles, and other premises, including but not limited to: keys, mail, envelopes, receipts for rent, rental agreements, bills from public utilities and telephone services, address books, and similar items. I know that these items are relevant to identifying the possessor of the controlled

substances, proceeds, records of money laundering, possessors of items seized, as well as the occupants and users of the premises, vehicles, or other locations searched.

104.    I know from my training and experience that drug dealing is a cash business and persons involved in the unlawful delivery and possession of controlled substances often keep large amounts of money, including U.S. currency, on hand. They maintain concealed stores of cash because they desire to avoid suspicion or detection by law enforcement, and have a need to accumulate money/U.S. currency in order to re-supply themselves with drugs. It is also necessary to keep cash on hand to conduct additional drug transactions, make change, and pay debts.

## Target Location

### 44 Goss Lane, Fair Grove, Missouri – Location #1

105.    Based on this investigation and facts set forth in this affidavit, I believe there is probable cause to search **LOCATION #1**, 44 Goss Lane, Fair Grove, Missouri, for items set forth in Attachment B.

106.    44 Goss Lane, Fair Grove, Missouri, is fully described in Attachment A. Southwest Electric Cooperative records show that current electric service is in the name of Leland Courtney and has been since October 2013. Investigators have determined **LOCATION #1** is used by JONES as a stash location for U.S. currency and proceeds based on the facts set forth above.

107.    Based on the above, I have probable cause to believe and do believe there is probable cause to request that the Court issue a search warrant directing the search of the location as described fully herein in the Western District of Missouri for the items described in Attachment B which are contraband or evidence, or are otherwise used to facilitate or promote, or which constitute proceeds of the crimes listed above.

108.     During the course of this investigation, several members of the DTO have been identified as members of the Southwest Honkeys prison gang.  Members of this gang have violent criminal histories, as well as histories of fighting with or fleeing from law enforcement.  The primary target of this investigation, William JONES, is currently in custody, but I know from my investigation, specifically the telephone calls above where JONES mentioned that EVANS was staying with the COURTNEYs, which was corroborated by GPS information from EVAN's telephone that showed him there during day time and night time hours, that gang members do stay at the COURTNEY's home.  EVANS is currently out of custody.  Additionally, six handguns have been seized from various members of the organization since the beginning of this investigation.  Based on the legitimate concern of the risk to officer safety, I am requesting the authorization to serve this warrant at any time, day or night.

109.     The ongoing investigation in this matter would be jeopardized if the targets mentioned in this affidavit or others had knowledge of the details of the investigation set forth in this affidavit.  Based on these concerns, I request that this affidavit, the application for the warrant, and the warrant as well as any other related documents be sealed.

         Further your affiant sayeth not.

                                   Jason Carter
                                   Task Force Officer
                                   Drug Enforcement Administration

Sworn to before me this  16 ᵗʰ  day of October November, 2017.

                                   DAVID P. RUSH
                                   UNITED STATES MAGISTRATE JUDGE
                                   WESTERN DISTRICT OF MISSOURI